Carroll
No. 80-047

THE STATE OF NEW HAMPSHIRE

v.

DAVID S. SANDS

THE STATE OF NEW HAMPSHIRE

v.

THOMAS A. TSOUMAS

August 29, 1983

572

574

576

580

*Gregory H. Smith,* attorney general (*Richard C. Nelson,* assistant attorney general, on the brief and orally), for the State.

*Brown & Nixon P.A.,* of Manchester, and *Tybursky & Watson,* of Portsmouth (*Stanley M. Brown* and *Thomas R. Watson* on the brief, and *Mr. Brown* orally), for the defendant David S. Sands.

*Nighswander, Martin, KillKelley & Kidder P.A.,* of Laconia (*David J. KillKelley* on the brief and orally), for the defendant Thomas A. Tsoumas.

BOIS, J. These are appeals from a consolidated jury trial wherein both defendants were found guilty of several counts of perjury. *See* RSA 641:1. The defendant David S. Sands, an attorney, was convicted under two indictments pending against him. The defendant Thomas A. Tsoumas, who was charged under five indictments, was convicted on three of the charges and acquitted on one; the fifth charge was nol prossed by the State while the jury was deliberating.

The Trial Court (*Dunfey,* C.J.) reserved and transferred all questions of law raised by the defendants' exceptions. We overrule all the exceptions and affirm the convictions of both defendants.

### I. *Facts*

These appeals arise out of three intricate transactions involving the defendants and various other individuals and entities. We will discuss each transaction separately and then outline the specific statements leading to the perjury indictments at issue.

### A. *Financing of "Wagner" Tract*

In 1973, George Schroeder operated Ossipee Builders, Inc., and controlled Knox Mountain Corporation (Knox), which owned land in the Ossipee area, including a development known as Indian Mound. Schroeder subsequently transferred his interests in Knox to his wife and two sons, but continued to manage the corporation. During this time, Knox was embroiled in litigation with the Indian Mound lot owners. *See Dove v. Knox Mt. Corp.,* 114 N.H. 278, 319 A.2d 640 (1974). Although the parties arrived at a partial settlement in that litigation, Knox did not have sufficient funds to satisfy its obligations under the settlement. In order to secure fulfillment of Knox's obligations, Attorney George W. Walker, of the law firm representing the Indian Mound lot owners, arranged to have Attorney John D. McLaughlin, Clerk of the Carroll County Superior Court, hold a

second mortgage as trustee on a tract of land which Schroeder had previously acquired for $76,200 from Wagner Woodlands (Wagner). Wagner held a purchase money first mortgage on the property.

In 1973, Schroeder was in default on the Wagner purchase money mortgage and consulted the defendant Sands about the possibility of additional private financing. Sands advised Schroeder that he knew of an individual who was interested in making a loan. The parties started negotiations for refinancing, but Schroeder died shortly thereafter. His son, David Schroeder, continued the negotiations, which resulted in the refinancing of the mortgage on February 15, 1974.

During George Schroeder's lifetime, the Wagner tract had been transferred, subject to the outstanding balance of the purchase money mortgage, to another of George's sons, Robert H. Schroeder. Robert was an attorney employed in Sands' law office, who did legal work for his father and his brother David. Robert subsequently transferred title to his sister Phyllis who, as part of the refinancing scheme, transferred title to "Ridgeview Realty Trust, David Schroeder, Trustee" (Ridgeview Trust), which was specifically created for that purpose. Simultaneously, and as part of the same transaction, a "Forest Preservation Trust, William Smith, Trustee" (Forest Trust) was created to lend money to Ridgeview Trust. On February 15, 1974, Forest Trust loaned Ridgeview Trust funds which were used to pay off the entire balance of the purchase money mortgage held by Wagner. The new loan provided Ridgeview Trust with terms more favorable than those of the previous Wagner purchase money mortgage. Upon learning of the refinancing, Attorney McLaughlin subordinated his second mortgage to that of Forest Trust.

Throughout all these negotiations, neither David Schroeder nor anyone else ever met "William Smith," the named trustee of Forest Trust. David Sands later alleged under oath that he created the Forest Trust to permit the loan to be made by his good friend, Thomas A. Tsoumas, who, for personal reasons, wished to maintain anonymity as the lender. Sands further testified that he loaned the defendant Tsoumas funds at the time of the closing, so as to enable the loan to be made.

B. *Financing of "Plante Property"*

The Forest Trust also made a $25,000 loan to Raymond and Janet Plante. The Plantes had purchased a summer resort property from one Roger Krey, who was represented by Attorney Frederick L. Cox, the part-time County Attorney for Carroll County. A bank held a first mortgage on the property, while Krey held a purchase money second mortgage, and the Forest Trust loan was secured by a third

mortgage on the real estate. The Plantes soon defaulted on their obligations, and on foreclosure, Sands, acting for Forest Trust, bought in the property, paid off the first and second mortgages, and refinanced the property.

At the time of the original sale to the Plantes, Krey and the Plantes had an understanding entitling the Plantes to select and purchase certain items on the property. Krey was entitled to remove any personalty that the Plantes did not take, but those articles which he did not remove would belong to the Plantes. Disputes arose, and Attorney Cox, representing Krey, who claimed a right of ownership in certain furniture, engaged in civil litigation against the Plantes.

The Plantes had also borrowed substantial sums of money from one Wilma Lee Rondella, who was an unsecured creditor. Attorney Robert C. Varney, who worked out of the same law office as Attorney Walker, brought suit for Rondella against the Plantes and obtained an *ex parte* attachment on the personal property which the Plantes had purchased at the summer resort.

The defendant Sands learned of Varney's attachment, and on February 1, 1977, acting on behalf of "William Smith, Trustee of Forest Trust," also filed a petition for *ex parte* attachment of the Plantes' personalty. Statements made in reference to the signing of the *ex parte* petition are the bases for both indictments against Sands and one indictment against Tsoumas. The other indictments against Tsoumas relate to statements made in reference to the signing of two bank withdrawal slips.

## C. *Blaeser/Knox Transaction and Litigation*

In 1972, Knox sold land out of the Indian Mound development to Gustav and Erika Blaeser, who had a home built on the land by George Schroeder's firm, Ossipee Builders, Inc. The land was encumbered by two undischarged mortgages held by the Carroll County Trust Company. When the Blaesers attempted to sell the premises in 1974, they discovered the two undischarged mortgages. The trust company, represented by Attorney Peter G. Hastings, subsequently sold the premises at a foreclosure sale.

The Blaesers brought suit against Knox through Attorney Peter H. Fauver. Attorney Robert Schroeder represented Knox and confessed judgment against the corporation. The judgment, however, appeared to be uncollectible against the company, and Fauver enlisted the aid of Attorney Varney in an effort to collect.

Varney subsequently sought to collect the judgment by obtaining a lien against the Wagner tract. The records at the registry of deeds revealed and confirmed the journey of the Wagner tract from Knox

to George Schroeder, to Robert Schroeder, to Phyllis Schroeder, to "David Schroeder, Trustee of Ridgeview Trust," and finally to Forest Trust as mortgagee. The deed to Ridgeview Trust, the Ridgeview declaration of trust, the Forest declaration of trust, and the mortgage to Forest Trust, were all recorded sequentially at the registry. Acting on behalf of the Blaesers, Varney filed a bill in equity to "Reach and Apply" (*Blaeser v. Schroeder*), alleging that Knox had been stripped of its assets to defraud its creditors, including his clients, the Blaesers. Several of the Schroeders were named as defendants. While still unidentified, "William Smith, Trustee of Forest Trust," was also made a defendant on the theory that under the circumstances he should have known about the alleged fraudulent transactions.

The defendant Sands became aware of the bill in equity and the fact that "William Smith" was named as a party defendant. Sands advised the Schroeders that he would represent Smith, and the Schroeders obtained other counsel.

### D. *Basis of Perjury Indictments*

The present perjury claims relate to confusion existing during the Blaesers' suit (*Blaeser v. Schroeder*) as to the identity of "William Smith." The identity of "William Smith" was significant in the *Blaeser* litigation for several reasons. First, "William Smith," through Sands, had appeared specially and filed a motion to dismiss for lack of jurisdiction. Resolution of this motion, which was ultimately denied by *King*, J., required knowledge of the identity of Smith and his contacts with the State of New Hampshire. Second, the Blaesers needed to know the identity of "William Smith" in order to show that he had participated in the allegedly fraudulent scheme. Finally, the identity of "William Smith" was significant to the Schroeder defendants because if Sands, their attorney in other matters, turned out to be Smith, they might have been able to show a breach of fiduciary duty and to set aside the Forest Trust mortgage.

The defendant Sands had refused to disclose William Smith's identity, to supply a street address, or otherwise to assist the Blaesers in completing service on Smith. Service was eventually made, pursuant to court order (*Douglas*, J.), by serving the Secretary of State and Sands, as Smith's attorney. Discovery in the *Blaeser* litigation to "Reach and Apply" began in January of 1977, and the Blaesers made additional efforts to determine the identity of "William Smith." On January 20, 1977, before Attorney Frederick L. Cox, acting as commissioner, Attorney Varney deposed Sands, who adamantly refused to answer any questions relating to Smith. On

March 7, 1977, at a hearing held before *Brock*, J., on a motion filed by Varney to compel answers, Sands alleged that the defendant Thomas A. Tsoumas was "William Smith." While testifying under oath, Sands was asked and replied to questions posed by the presiding justice in reference to the *Plante ex parte* attachment petition which Sands had filed on behalf of Smith. The exchange, in pertinent part, was as follows:

"Question: And who signed William Smith's name there [on the trust instrument and *ex parte* attachment petition]?

Answer: Thomas Tsoumas.

Question: And did he sign in your presence?

Answer: In one instance he did. In the other instance, he handed it to me and said he had signed it. He acknowledged . . . .

Question: Which instance is which?

Answer: I believe the trust instrument he signed in my presence and in the court suit he handed it to me and indicated that he had signed it."

This testimony is the basis of indictment No. 3722 against David S. Sands which charges that the statement as to the identity of the signatory of the *ex parte* attachment petition was false.

The defendant Thomas A. Tsoumas, identified by Sands as allegedly being "William Smith, Trustee," was subsequently deposed on April 24, 1977, before *Michael C. Murphy*, Esq., as commissioner. Tsoumas alleged that he was "William Smith" and that he had signed the petition for the *ex parte* attachment in the *Plante* case when he visited Sands' home on January 31 or February 1, 1975. He identified as his signature the "William Smith" signature on various other documents, including withdrawal slips from the Wolfeboro National Bank. He also provided handwriting samples.

As a result of the answers provided in his deposition, five indictments were returned against Tsoumas. Indictment No. 3724, on which a guilty verdict was returned, alleged that at the deposition he knowingly made a false material statement under oath, in response to questions asked, to wit:

"Question: Now Mr. Smith—Mr. Tsoumas, I show you three withdrawals from the Wolfeboro National Bank dated [in] January, I'll start with the first one, January 16, 1975, and ask you if you can identify it.

Answer: Yes.

Question: And did you sign the name William Smith as it appears at the bottom of this withdrawal?

Answer: Yes, I did."

Indictment No. 3725, on which Tsoumas was also found guilty, was similar to No. 3724 but dealt with a withdrawal slip dated June 14, 1975.

Indictment No. 3727, in which a guilty verdict was returned against Tsoumas, is related to the two indictments returned against Sands in that it involved the signing of the *ex parte* attachment petition. In indictment No. 3727, the State alleged that Tsoumas knowingly made a false material statement under oath, in response to the following questions:

"Question: Now, particularly with reference to the document filed by you recognized as having been the *ex parte* petition to attach, in the case of your trust against the Plantes, that document was signed personally by yourself?

Answer: Correct.

Question: It was signed at the home of David Sands?

Answer: Correct.

Question: You're absolutely certain of that?

Answer: Correct.

Question: You're absolutely certain of that?

Answer: I'm absolutely certain."

Subsequent to obtaining handwriting samples from Tsoumas, Attorney Hastings, who represented all the Schroeder interests in the *Blaeser* litigation, except for those of Robert Schroeder, moved for permission to authenticate the signatures on the various documents produced, and for authority to depose Sands and two of his employees. On April 27, 1977, a hearing on this motion was held before *Brock*, J. A secretary in Sands' office, Linda C. Clough, testified that on Saturday, February 1, 1975, she was called in to work and that she typed two documents for Sands. She insisted that one of these was the petition for the *ex parte* attachment in question. Her recollection was that she and Sands were the only persons in the office, that she typed the petition and gave it to Sands without signatures, and that he took it into his office and returned with it signed "William Smith."

Sands was warned by the court that grounds for possible discipli-

nary action or criminal prosecution might exist if the evidence and resulting inferences that he had signed the petition turned out to be true. He claimed, however, that Clough was mistaken. He voluntarily took the stand at the motion hearing and testified under oath as to the circumstances under which Tsoumas allegedly signed the petition for *ex parte* attachment. He claimed that he had prepared the petition on the evening of January 31, 1977, that Tsoumas had driven from Boston to Sands' home and had signed the petition on the same evening, and that Clough had typed only the writ of summons and the writ of attachment. This testimony is the basis for indictment No. 3723, which read in part as follows:

> "David S. Sands . . . did, during a hearing on motions . . . knowingly make a false material statement under oath, in a direct statement of witness, to wit: 'Well, as it turned out, Tom came up that night, I had him sign the petition for Ex Parte Attachment but apparently I did not sign all of the copies' when in fact defendant did not believe this statement to be true, and in fact said statement was false."

II. *Law*

The defendants have each filed a separate brief and have divided the responsibility for discussing the numerous legal issues presented. Any issue addressed by the court is applicable to one or both defendants as may be appropriate.

A. *Sufficiency of the Indictments*

The defendant Tsoumas filed a motion to dismiss the perjury indictments against him, alleging that they were vague and uncertain, and that they did not allege criminal conduct. He claimed that the indictments did not fully and substantially inform him of the allegations and accusations against him so that he might adequately prepare for trial. On October 20, 1977, on the third day of hearings on the motion, Sands' attorney joined in the Tsoumas motion to dismiss. On October 10, 1978, the trial court denied the motion.

We have repeatedly held that an indictment must contain sufficient information to advise a defendant of the offense with which he is charged. *E.g., State v. Shute*, 122 N.H. 498, 504, 446 A.2d 1162, 1165–66 (1982); *State v. Taylor*, 121 N.H. 489, 495, 431 A.2d 775, 778 (1981); *State v. Bussiere*, 118 N.H. 659, 661, 392 A.2d 151, 153 (1978). It must state the elements of the offense with enough specificity to permit the defendant to prepare for trial and to protect him, whether acquitted or convicted, from later being placed in jeopardy for the same offense. *State v. Shute*, 122 N.H. at 504, 446

A.2d at 1165; *State v. Merski*, 121 N.H. 901, 914, 437 A.2d 710, 718 (1981), *cert. denied*, 455 U.S. 943 (1982). The test is not whether the information could be more comprehensive and certain, but only whether the indictment meets the basic requirements of specificity and fair notice. *State v. Manchester News Co.*, 118 N.H. 255, 257, 387 A.2d 324, 327, *appeal dismissed*, 439 U.S. 949 (1978).

■ In this case, the indictments alleged that the respective defendants knowingly made false material statements under oath. Each indictment identified the date of the statements and the specific deposition or motion hearing where the statements were made. In addition, each indictment quoted the allegedly false statement upon which it was based. Contrary to the defendant Tsoumas' arguments, we find that the reference in the indictment to the deposition session occurring during the *Blaeser* litigation sufficiently advised him that his allegedly false statements were made during the course of an "official proceeding"; namely, the *Blaeser* litigation for which the deposition was taken. *See* RSA 641:1 (perjury must occur during "official proceeding"). It was also apparent that the statements were alleged to be material to the underlying *Blaeser* litigation, because "material means capable of affecting the course or outcome of the [official] proceeding" at issue, RSA 641:1, II, and, as we have noted, the *Blaeser* suit constituted the official proceeding in this case. We therefore conclude that the indictments sufficiently warned the defendants of the charges against them.

B. *Sufficiency of the Evidence*

Both defendants challenge the sufficiency of the evidence and argue that the trial court should have entered directed verdicts of acquittal. The main thrust of their argument is that the evidence did not support guilty verdicts beyond a reasonable doubt because the only evidence of falsity produced by the State was the testimony of Linda Clough, and all the other evidence proved that she was in error. We are not persuaded by this argument.

■ In considering the sufficiency of the evidence and the denial of motions for directed verdicts, we must determine whether any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Cyr*, 122 N.H. 1155, 1159–60, 453 A.2d 1315, 1318 (1982); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). It is elementary that we must consider all the evidence, including circumstantial evidence and all reasonable inferences that arise therefrom, in the light most favorable to the State. *State v. Cyr*, 122 N.H. at 1159, 453 A.2d at 1318; *State v. Goupil*, 122 N.H. 857, 859, 451 A.2d 1284, 1286 (1982).

The record before us reveals that the credibility and expertise of the witnesses was a central issue at trial. The testimony of Linda Clough and that of the defendants as to the preparation and execution of the *ex parte* attachment in the *Plante* litigation was irreconcilably contradictory. The experts, likewise, were divided in their opinions. The State's expert testified that, with the possible exception of a bank card, Tsoumas did not sign the name "William Smith" on any of the documents in question. The expert, however, could not conclude that Sands either had or had not signed the name "William Smith." Sands' expert ruled out Sands as the signatory and expressed the opinion that Tsoumas probably did sign some of the documents. Tsoumas' expert testified that in her opinion Tsoumas had authored the signatures of "William Smith."

We have held that the weight and credence to be given to the evidence at trial is the very essence of a jury's function. *State v. Osborne*, 119 N.H. 427, 436, 402 A.2d 493, 499 (1979). The jury observes the witnesses, hears their testimony, and judges their credibility; it is not bound by the evidence and may accept or reject the evidence in whole or in part. *State v. Thresher*, 122 N.H. 63, 71, 442 A.2d 578, 582 (1982); *State v. Rullo*, 120 N.H. 149, 152, 412 A.2d 1009, 1012 (1980). When there is conflicting evidence before a jury, as in this case, we will not review the jury's decision on the issue of credibility. *State v. McAvenia*, 122 N.H. 580, 582, 448 A.2d 967, 968 (1982). Our review in this area is limited only to the sufficiency of the evidence. *Id.*, 448 A.2d at 968.

The defendant Tsoumas argues that the witness Clough's testimony, alone, was an insufficient basis for conviction. He claims that in this State a perjury conviction must be supported, at a minimum, by the testimony of two witnesses or by direct testimony of one witness and evidence of corroborating circumstances.

The current perjury provision, RSA 641:1, fails to address the quantum of evidence necessary for conviction. Although the former perjury statute specifically abolished the common-law rule requiring proof by a particular number of witnesses and type of evidence, *see* Laws 1967, 358:1, that statute was superseded in 1973 when the legislature enacted a new Criminal Code encompassing perjury and several other falsification offenses. *See* RSA ch. 641. However, there is no indication that the repeal of the former statute was intended to resurrect the common-law rule, and we refuse to readopt the rule. *See* RSA 21:39. We find no reason to treat the proof required in a perjury case any differently from that required for other serious offenses, such as murder and rape. *See State v. Storey*, 148 Minn. 398, 402–03, 182 N.W. 613, 615 (1921). *See generally*

*Hourie v. State*, 452 A.2d 440, 443–54 (Md. Ct. Spec. App. 1982); 7 WIGMORE ON EVIDENCE § 2041, at 275–77 (3d ed. 1940). As long as the evidence establishes guilt beyond a reasonable doubt, we hold that perjury may be established entirely by circumstantial evidence. *Cf. State v. Gage*, 116 N.H. 656, 659, 366 A.2d 501, 503 (1976) (conviction based entirely upon circumstantial evidence proper under former perjury statute).

 As we have noted above, Clough's testimony indicated that she prepared the petition for *ex parte* attachment in the *Plante* case and that Sands signed it shortly thereafter. A handwriting expert testified that he did not believe Tsoumas had signed either the petition or the other documents. The evidence further revealed that Sands was closely associated with the interests of "William Smith," that he persistently refused to divulge Smith's identity, and that the alleged reasons for Tsoumas' anonymity could have been found to be suspect. Based on this evidence, the jury could have concluded that Sands was in fact "William Smith" and that he had affixed the signature "William Smith" to the *ex parte* petition for attachment. As a result, we hold that the evidence supported the jury's verdicts with respect to both defendants, as well as the trial court's denial of the motions for dismissal and for directed verdicts.

### C. *Materiality*

The defendants submit that the trial court erred in ruling as a matter of law that the statements at issue were material. They basically claim that because materiality is an essential element of the offense, it is a jury question which the State must prove beyond a reasonable doubt. Relying on *State v. Cushing*, 119 N.H. 147, 399 A.2d 297 (1979), as well as on the Federal and State Constitutions, they argue that, by withdrawing the consideration of materiality from the jury, the trial court denied them their fundamental right to trial by jury. We disagree.

We note at the outset that the trial court's action was consistent with RSA 641:1, which expressly provides that "materiality is a question of law to be determined by the court." Thus, the real issue presented is whether the statute satisfies constitutional standards.

 The Federal and State Constitutions establish the right to a jury trial in criminal cases. U.S. CONST. amends. VI and XIV; N.H. CONST. pt. I, art. 15; *see State v. Cushing*, 119 N.H. at 148, 399 A.2d at 298. We have interpreted these constitutional provisions as entitling a defendant to a jury determination on all *factual* elements of a crime. *See, e.g., State v. Champagne*, 119 N.H. 118, 121, 399 A.2d

287, 289 (1979); *State v. Goodwin*, 118 N.H. 862, 869, 395 A.2d 1234, 1238 (1978). The right to trial by jury does not, however, extend to consideration of questions of law; these issues obviously fall within the domain of the court. 75 AM. JUR. 2d *Trial* § 319, at 391–92 (1974).

 With these principles in mind, we must now decide whether the determination of materiality is properly designated as a question of law. Materiality involves the relationship between the alleged false statements and the official proceeding at issue. *See* RSA 641:1, II. It is clear that the determination whether the allegedly false statements were made at an official proceeding is ultimately a question of fact for the jury. We hold, however, that the question of materiality, the examination of the often complex relationship between the statements and the proceeding, is a legal issue for the court.

Our research reveals that this position is widely accepted. *See* 4 WHARTON'S CRIMINAL LAW § 618, at 345 (14th ed. C. Torcia 1981); Annot., 62 A.L.R.2d 1027, 1027–28 (1958); ALI MODEL PENAL CODE § 241.1(2) (1962). For instance, in *Sinclair v. United States*, 279 U.S. 263, 298 (1929), the United States Supreme Court stated that "[u]pon reasons so well known that their repetition is unnecessary, it is uniformly held that . . . the materiality of what is falsely sworn, when an element in the crime of perjury, is one for the court." (Citations omitted.) Since that decision, a legion of federal courts, including the First Circuit Court of Appeals, has also held that materiality is a question of law to be decided by the trial court. *See Russell v. United States*, 369 U.S. 749, 755–56 (1962); *United States v. Kehoe*, 562 F.2d 65, 68 (1st Cir. 1977); *see also United States v. Dipp*, 581 F.2d 1323, 1328 (9th Cir. 1978), *cert. denied*, 439 U.S. 1071 (1979); *United States v. Damato*, 554 F.2d 1371, 1373 (5th Cir. 1977); *United States v. Demopoulos*, 506 F.2d 1171, 1176 (7th Cir. 1974), *cert. denied*, 420 U.S. 991 (1975); *Dolan v. United States*, 218 F.2d 454, 457 (8th Cir. 1955); *United States v. Moran*, 194 F.2d 623, 626 (2d Cir. 1952).

In addition, approximately twenty-six state jurisdictions hold that materiality is a question of law for the court, although eight of these states further hold or recognize that, in special instances, the issue of materiality may become a mixed question of law and fact to be submitted to the jury under appropriate instructions. *See* Annot., 62 A.L.R.2d at 1036. We could find only a few jurisdictions which hold that the question of materiality is a jury question. *See Commonwealth v. McDuffee*, 379 Mass. 353, 398 N.E.2d 463 (1979); *Pope v. State*, 43 Ga. App. 175, 182–83, 158 S.E. 350, 353–54 (1931); *People v. Clemente*, 285 A.D. 258, 262, 136 N.Y.S.2d 202, 206 (1954).

█ █ In light of our view that materiality involves the *legal relationship* between certain facts which are to be found by the jury, as well as of the widespread support for this position by other courts, we hold that RSA 641:1 correctly categorizes materiality as a question of law. As a *legal* issue, the determination of materiality did not fall within the constitutional requirement for jury determination of all *factual* elements. The defendants therefore were not entitled to a jury determination on this issue. We conclude that their constitutional rights were fully safeguarded when the trial court properly submitted all *factual* elements to the jury.

The defendants intertwine their argument on materiality with a further claim that the State failed to prove beyond a reasonable doubt that the statements concerning the identity of the person signing the petition for *ex parte* attachment in the *Plante* case were material to the civil case of *Blaeser v. Schroeder,* the "official proceeding" during which the allegedly false statements were made. They assert that in finding the statements material, the trial court failed to use the "beyond a reasonable doubt" standard mandated by the United States Supreme Court in *In re Winship,* 397 U.S. 358, 364 (1970).

█ The defendants, however, misinterpret the *Winship* decision. In that case, the Supreme Court held that a defendant is protected against conviction unless the State establishes every *element* of the offense beyond a reasonable doubt. *Id.* The decision does not mandate any evidentiary burden for *legal issues* such as materiality; therefore, these issues need not be proved beyond a reasonable doubt. *See United States v. Watson,* 623 F.2d 1198, 1201–02 (7th Cir. 1980); *United States v. Giacalone,* 587 F.2d 5, 7 (6th Cir. 1978), *cert. denied,* 442 U.S. 940 (1979). Questions of law, for that matter, need not be proved even by a preponderance of the evidence. As the Federal Court of Appeals for the Seventh Circuit recently stated:

> "A question of law is by definition susceptible of only two answers: 'yes,' the requirements of legal principle are met or 'no,' they are not met. There is, in theory at least, no continuum of assurance and dubiosity as to the establishment of a proposition of law similar to the varying degrees of certainty and uncertainty which may be ascribed to propositions of fact."

*United States v. Watson,* 623 F.2d at 1202.

█ We are aware that RSA 625:10 requires that each element of an offense be proved beyond a reasonable doubt. Nevertheless, consistent with the above analysis, we find that by properly cate-

594

gorizing the element of materiality as a question of law for the court, *see* RSA 641:1, the legislature has clearly recognized that this element is not subject to the mandates of RSA 625:10.

 The record reveals that the trial court made the following finding with respect to materiality:

"[O]n all the evidence, the proof or disproving of the fact of identification of a prime defendant in the 'Blaeser v. Schroeder' case, namely, Smith, Trustee of Forest Preservation Trust, became essential and thus *material to that proceeding, establishing that fact as such having a legitimate tendency to influence the course and thus potentially the outcome of that case,* irrespective of the main issues raised in the case or the decision that may have been rendered on the merits of that case or cases.

Indeed the evidence reveals clearly the course of the proceedings were affected in 'Blaeser v. Schroeder.' [U]nnecessary hearings were had . . . depositions were taken, impoundment orders issued . . . motion hearings, coupled with time passing without any progress. . . . [E]xpenses obviously incurred or resulting from failure to disclose . . . the identification of a defendant . . . which the court rules was a proper matter for inquiry.

Accordingly, on all the evidence . . . coupled with surrounding circumstances, the court finds *beyond a reasonable doubt* the statements in question were material and . . . capable of affecting the course and outcome of other underlying civil litigation of 'Blaeser v. Schroeder' . . . . Inherent in that finding is a finding and ruling as a matter of law that the statements were material."

(Emphasis added.) These findings and rulings are supported by the record, which shows that Smith's identity was significant for purposes of jurisdiction, discovery, and substantive recovery in the *Blaeser* litigation. The defendants, moreover, have little to complain about because, as the above rulings indicate, the trial judge found the statements material beyond a reasonable doubt and therefore imposed a more stringent burden of proof than was necessary.

The defendants next argue that the court's determination of materiality as a matter of law unconstitutionally deprived them of their right to have the jury determine whether they were guilty of the lesser-included offense of false swearing, which contains no requirement of materiality. *See* RSA 641:2; *see also State v. Bacon,* 114 N.H. 306, 310, 319 A.2d 636, 639 (1974); 4 WHARTON'S CRIMINAL PROCE-

DURE § 545, at 28–29 (12th ed. C. Torcia 1976); 2 NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE & PROCEDURE § 818, at 35 (R. McNamara 1980).

 We find no merit to this argument. It is clear that a defendant is not entitled to a "lesser-included" instruction as a matter of right under all circumstances. *See State v. Bergeron*, 115 N.H. 70, 73–74, 333 A.2d 721, 724 (1975); *see, e.g., State v. Bacon*, 114 N.H. 306, 310, 319 A.2d 636, 639–40 (1974). To be entitled to such an instruction, the lesser-included offense must be included in the greater offense, and the evidence must warrant the "lesser-included" instruction. *State v. Boone*, 119 N.H. 594, 597, 406 A.2d 113, 114 (1979); *see Beck v. Alabama*, 447 U.S. 625, 635–37 (1980). *See generally* 2 NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 818, at 35 (R. McNamara 1980).

 A comparison of RSA 641:1 (perjury) and RSA 641:2 (false swearing) reveals that the only difference between the elements of the felony of perjury and the elements of the misdemeanor of false swearing is that of materiality. It necessarily follows that if a statement is material as a matter of law, then a defendant could not be guilty of false swearing. In such a case, the defendant must be guilty either of perjury or of no offense at all, and the "lesser-included" offense charge therefore would not be warranted. *People v. Clemente*, 285 A.D. at 274–75, 136 N.Y.S.2d at 217–18 (Brietel, J., dissenting); 4 WHARTON'S CRIMINAL PROCEDURE § 545, at 29 (12th ed. C. Torcia 1976).

 On appeal, the defendants also submit that the trial court erred in allowing evidence on the question of materiality to be presented to the jury, because the court had decided to withhold that element of the crime from the jury's consideration. Although there was a general reference to this issue at a conference held by the court one year prior to trial, there is no evidence that the defendants took an objection or even brought the issue to the court's attention at the time of trial. *See United States v. Demopoulos*, 506 F.2d at 1176–77. The rule requiring timely objections to alleged errors in the trial is intended to give the court an opportunity to correct any possible error. *State v. Cass*, 121 N.H. 81, 82–83, 427 A.2d 1, 2 (1981). Alleged errors discovered by combing the record after trial and never properly presented to the trial judge will not constitute a sufficient basis for setting aside a verdict. *Id.* at 83, 427 A.2d at 2–3; *see State v. Niquette*, 122 N.H. 870, 873–74, 451 A.2d 1292, 1294 (1982). Furthermore and perhaps most significantly, even if the defendants had properly raised this issue at trial, it is clear that the challenged

evidence on materiality was closely linked to the issues of falsity and mental state, and was admissible on those subjects. *See United States v. Demopoulos,* 506 F.2d at 1177. As a consequence, the defendants were not prejudiced by the admission of this evidence before the jury. *Id.*

### D. *Tax Fraud Cover-up*

The record discloses that in his opening statement the prosecutor stated that the evidence would show that the Forest Trust was a tax shelter to provide Sands with tax-free income, because no tax returns were filed reporting certain interest income of the trust. The trial court permitted into evidence testimony indicating that in April 1977, subsequent to the first public assertion that he was allegedly "William Smith," the defendant Tsoumas filed fiduciary returns for the Forest Trust for the years 1974, 1975, and 1976.

The defendant Sands testified at trial that there were no tax shelters involved in the creation of the Forest Trust. He stated that he had never obtained an identification number for the trust, and that although he had received tax forms for reporting the trust's interest income, he had forwarded them to Tsoumas. There was also testimony that the Internal Revenue Service (I.R.S.) audited Sands' 1975 tax return, and that they found no errors and accepted the return as filed.

In his closing statement to the jury, the prosecutor argued:

> "I told you this in my opening statement. He [Sands] was creating a tax shelter. That was too kind on my part. This isn't a tax shelter, this is an out-and-out tax fraud."

The defendants challenge the propriety of this argument on several grounds. The defendant Sands claims that the argument was improper and prejudicial as it was based on insufficient evidence and charged him with a separate felony offense for which he was never indicted and for which he was not on trial. The defendant Tsoumas contends that the argument was prejudicial to him because, although the prosecutor's remarks specifically referred to Sands, they implied that Tsoumas took part in a cover-up of the alleged "tax fraud." The defendants further claim that the argument violated previous trial court rulings limiting the scope of the State's argument. Finally, they submit that the allegedly improper argument was made after a lengthy trial under circumstances in which the prosecution knew, or should have known, that the charge of tax fraud was false and that, as such, the statement constituted prosecutorial misconduct.

We first examine the trial court's rulings and the alleged viola-

tions by the State. As previously mentioned, the court initially allowed evidence as to when and by whom interest income of the Forest Trust was reported to the I.R.S. In denying a motion for a mistrial made by the defendants after this evidence was introduced, the court noted that the evidence had some probative value, particularly with respect to the identity of "William Smith," which it recognized as a central issue in the case.

Prior to closing arguments of counsel, the defendants filed a "Motion to limit the State's closing argument." Following a hearing on the motion, the court ruled that the State could not use the terms "conspiracy" or "prior crimes" in its closing argument. The court also foreclosed any reference by the State to a third indictment, to which Sands had entered a not-guilty plea and which was pending and awaiting trial. The court further stated:

> "In so ruling the court is not foreclosing the state from arguing any reasonable inferences which the jury may draw from all the evidence.
>
> In terms of the actions, conduct, motive-wise or otherwise, of either defendant, their course of conduct . . . the fact that something may have been created by design, plan, aim, pattern of action, course of conduct and the like, the court is not foreclosing such suggestions be they on the issue of credibility, motive, or what have you."

Both defendants objected and excepted to the court's ruling because it did not limit the State's argument to the extent they had desired.

The "tax fraud" statement was made near the close of the State's summation to the jury. Counsel for Sands objected and moved for a mistrial on the grounds that "there is no such evidence in the case." The court allowed the argument to stand and, in effect, ruled that the argument did not violate its order or instructions. Both defendants joined in excepting to the court's ruling, as well as to the denial of a mistrial.

■ We hold that the trial judge, who had issued the limiting order immediately prior to the tax-fraud argument, was in the best position to determine whether the argument violated the order. Consequently, we cannot say that the court erred in finding the argument consistent with its order.

■■ We next examine whether the evidence at trial supported the reference to "tax fraud" and, if so, whether the argument was unduly prejudicial. It is well settled that great latitude is accorded counsel in closing argument, wherein he may summarize and discuss the evidence and draw reasonable inferences therefrom.

*State v. Glidden,* 122 N.H. 41, 48, 441 A.2d 728, 732 (1982); *State v. Carroll,* 120 N.H. 458, 460, 417 A.2d 8, 10 (1980). The prosecution may elaborate on evidence relating to any motive, plan, or scheme which would explain the defendant's alleged conduct. *See* 1 WHARTON'S CRIMINAL EVIDENCE § 170, at 317–18 (13th ed. C. Torcia 1972); *see also State v. Palumbo,* 113 N.H. 329, 332, 306 A.2d 793, 796 (1973). The prosecution may not, however, discuss or state as facts matters which are not in evidence. *State v. Glidden,* 122 N.H. at 48, 441 A.2d at 732. *See generally* 2 NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 805, at 23 (R. McNamara 1980); 3 WHARTON'S CRIMINAL PROCEDURE § 523, at 453–54 (12th ed. C. Torcia 1975).

■■■ The evidence in this case raised serious questions as to the identity of "William Smith," the reason for his anonymity, and the purpose of the Forest Trust. The testimony of Linda Clough and the handwriting experts, and the evidence as to Sands' intimate relationship with the Forest Trust, created a clear inference that Sands was "William Smith." The evidence further showed that the income of the Forest Trust from 1974 through 1976 was not reported to the I.R.S. until April 1977, when Tsoumas, whose alleged identity as "William Smith" was disclosed one month earlier, filed fiduciary returns. We conclude that this evidence could support the inference that Sands intended to perpetrate a tax fraud. In addition, we hold that the State's reference to "tax fraud" was not calculated to charge the defendant with a separate crime, but was merely an attempt to establish a possible motive or scheme which would have led Sands to lie about the signatures on the documents at issue.

We now turn to the defendants' allegations of prosecutorial misconduct. We note that at no time during trial did either of the defense counsel advise the court that the basis of their objections and exceptions was their claim that the State's argument was "prosecutorial misconduct," as is now urged on appeal. After trial, on December 20, 1978, however, the defendant Sands filed a motion to set aside the guilty verdicts. The defendant Tsoumas filed a motion for judgment of acquittal on all indictments or, in the alternative, to set aside the verdicts and require a new trial. These motions recited that the prosecution in its opening statement referred to the defendant Sands' actions as attempts to create a tax shelter, that during the trial the prosecutor made reference to a "tax scheme," and that in his closing statement the prosecutor argued tax fraud as the motive for the alleged perjury. The defendants asserted that the State previously had not claimed or charged tax fraud, and that no such evidence was introduced at trial, but rather that Sands had

produced evidence that his tax return for 1975 was accepted by the I.R.S. as filed. Prosecutorial misconduct was argued by the defendants at a hearing held on February 8, 1979, before the trial justice who, on February 15, 1979, denied the motions, noted the defendants' exceptions, and transferred them to this court along with all other exceptions.

The audit of the defendant Sands' tax return had been initiated in August 1977, shortly before the State indictments were handed down. The I.R.S. conducted the audit during the early part of 1978 while the defendants were preparing their defense for trial. Sands learned that the audit had been prompted as a result of information which the I.R.S. had received from an informant. Sands believed that the informant was a member of the prosecution staff, and on April 20 and May 8, 1978, he requested the I.R.S., pursuant to the Freedom of Information Act (FOIA), to reveal the identity of the informant. When such information was denied on the ground that it was exempt from disclosure as it would identify a "confidential source," Sands brought a FOIA suit in the United States District Court for the District of New Hampshire, seeking disclosure of the requested information. The district court denied the requested relief, but indicated that Sands was not foreclosed from discovering other evidence to prove his case for prosecutorial misconduct. The district court specifically stated that "the plaintiff [Sands] on direct appeal to the New Hampshire Supreme Court might request a remand to the superior court for the purpose of conducting an evidentiary hearing wherein the prosecution itself might be directly questioned." The United States Court of Appeals for the First Circuit upheld the district court decision on November 6, 1980.

Meanwhile on July 14, 1980, some eighteen months after trial, the defendants filed in the superior court a "motion to enlarge record and for further findings and rulings." This filing was prompted by the statement in the federal district court's decision that Sands was not foreclosed from additional discovery. In their motion, the defendants asserted that the additional information which they sought would reveal that the "confidential informant" was either a member of the prosecution staff or a person closely allied with the prosecution. They claimed that at some point prior to or during trial, information concerning Sands' tax affairs was disclosed either directly or indirectly to the prosecution, and that the State thus knew the scope and result of the audit when it alluded to the alleged tax fraud in closing argument.

The Federal Government, by its attorneys, moved the superior court to quash subpoenas duces tecum which had been served upon its current and former employees. The Government sought to pre-

vent public disclosure of documents or testimony to the extent that they would directly reveal the identity of confidential informants. The Government requested the trial court to examine, *in camera,* affidavits identifying the individual who furnished the information at issue, as well as four specified documents which, in the Government's view, would lead to the disclosure of the confidential source. The Government requested the court not to order disclosure unless the court found that the legitimate needs of the defendants in preparing their defense outweighed the public interest in protecting the flow of information regarding possible violations of the law. *See Roviaro v. United States,* 353 U.S. 53, 61–62 (1957).

The State joined the federal authorities' position by filing a "motion to limit defense inquiry." The gist of both the State and federal arguments was that the identity of the confidential informant was not required in order to establish whether the scope or the outcome of the audit was made known to the prosecution prior to the State's closing argument. They further argued that this information could be obtained by questioning the prosecutors as well as any persons who might have communicated with the prosecution officials.

The same judge who had presided at trial, *Dunfey,* C.J., held a hearing, lasting ten days, on the motion to enlarge the record. The defendants presented evidence through numerous witnesses and documents. Finally, the court examined *in camera* the affidavits and the four documents submitted by the I.R.S. Based upon its examination of the documents, as well as upon all the evidence elicited during the course of the jury trial and motion hearing, the court found that disclosure was not warranted. The court further ruled that no prosecutorial misconduct existed, and it denied the motions to set aside the verdicts of guilty or in the alternative for a new trial. The defendants took exceptions to this ruling.

We find no error in the court's ruling. The evidence examined by the trial judge *in camera* reveals that the confidential informant was *not* a member of the prosecution team nor even closely allied with it. A review of the entire record also fails to show that the prosecution knew or should have known that the tax-fraud argument was erroneous. Although Sands testified at trial that the I.R.S. had audited and accepted one of his tax returns, he failed to introduce any documentary proof in support of this claim. The prosecutor, who had no obligation to accept Sands' statement, testified that he did not learn of the outcome of the audit until the return was introduced at the post-trial hearing.

Furthermore, even if the audited return had been introduced at trial, we cannot say that it would have barred the State

from arguing tax fraud as a possible motive for the alleged crimes. The 1975 audit was limited in scope. The I.R.S. focused upon whether Sands paid the correct amount of tax on his reported income for that year, rather than upon whether he had received income from the Forest Trust which he did not report. Additionally, the audit did not involve any investigation of Sands' tax returns in other years during the existence of the Forest Trust. Finally, the I.R.S. auditor did not examine the Forest Trust and was unable to say whether Sands had received and subsequently failed to report income from the trust.

In view of these facts and of our earlier conclusion that the evidence gave rise to an inference of tax fraud, we hold that the trial court committed no error in ruling that the State did not transgress the bounds of legitimate advocacy when it referred to tax fraud as a possible motive for the defendants' actions. *See State v. Nelson*, 103 N.H. 478, 490, 175 A.2d 814, 822–23 (1961), *cert. denied*, 369 U.S. 879 (1962).

E. *Sufficiency of the Oath*

The defendant Tsoumas assigns as error the trial court's ruling that his deposition statements were made while under the required or authorized oath. He testified that he recalled being under oath and understood that he had an obligation to tell the truth. He also stated that the deposition substantially conformed to the best of his memory and that he had agreed, as is customary in this State, to waive the requirement that he sign the deposition after its completion. On appeal, he argues that the oath given to him was insufficient because it did not satisfy the oath requirements of the deposition statute, RSA 517:7, which provides that "[e]very witness shall subscribe his deposition, and shall make oath that it contains the truth . . . relative to the cause for which it is taken." Specifically, he claims that the oath was invalid under RSA 517:7 because it was administered *before* his deposition was taken and because he did not sign the deposition. We disagree.

The requirements of RSA 517:7 relate to the admissibility of depositions into evidence. Here, however, we are not concerned with whether the defendant Tsoumas' deposition would have been admissible in the proceeding in which it was taken. Our examination concerns only whether the elements of perjury under RSA 641:1 have been proved. This court has long recognized that a deposition or affidavit which is inadmissible at trial may form the basis of a perjury conviction. *State v. Whittemore*, 50 N.H. 245, 248 (1870), *overruled on other grounds*, *State v. Hogg*, 118 N.H. 262, 267, 385

A.2d 844, 847 (1978); *see State v. Langley,* 34 N.H. 529, 533 (1857). Thus, the requirements of RSA 517:7 are inapposite in this case.

 Under RSA 641:1, perjury is committed when a person makes a false material statement under oath in an official proceeding, and he does not believe the statement to be true. The statute establishes a general requirement that an oath be administered; it makes no reference to the timing of the oath or to any need for subsequent confirmation by subscription. The oath is required essentially to impress upon the individual his obligation to tell the truth. *Cooper v. Bisbee,* 4 N.H. 329, 336 (1828); *see State v. Assuntino,* 180 Conn. 345, 354, 429 A.2d 900, 904 (1980). *See generally* 58 AM. JUR. 2d *Oath and Affirmation* § 1, at 844 (1971). The requirements concerning the timing of the oath and confirmation by subscription are formalities which are irrelevant to this objective. These factors therefore had no bearing on the sufficiency of the oath in the perjury prosecutions at issue, and the defendant Tsoumas was not entitled, as he claims, to an instruction to the contrary. *See generally* ALI MODEL PENAL CODE § 241.1(3) (1962); Annot., 80 A.L.R.3d 278, 285, 303–05 (1977).

### F. *The Search Warrant*

In June 1977, the Carroll County deputy sheriff prepared an affidavit and an application for a warrant to search for various documents that had been filed in the *Blaeser* litigation. The documents, which were in the custody of the Carroll County Superior Court, included a handwriting exemplar of Tsoumas, two promissory notes from Tsoumas to Sands, and an additional agreement between Tsoumas and Sands. On June 24, 1977, the deputy sheriff appeared *ex parte* before the Justice of the Ossipee District Court. Based upon the deputy sheriff's application, affidavit, and oral testimony, the district court issued the search warrant, and the documents were seized three days later. At trial, the defendants sought unsuccessfully to suppress the documents.

The defendants attack the validity of the search warrant on several grounds. They first claim that the affidavit and oral testimony in support of the application for the search warrant were insufficient because they were based upon hearsay and did not contain facts upon which a magistrate could independently make an evaluation of probable cause. They also allege that the warrant was defective because the magistrate did not fully understand the criminal charges involved. We are not persuaded by these arguments.

The portion of the affidavit that formed the basis for the magistrate's finding of probable cause is as follows:

"I . . . [Deputy Sheriff Kilmer] . . . have information, supplied to me by Frederick L. Cox, County Attorney for Carroll County for more than 8 years last passed and an attorney at law practicing in this state for almost 20 years, to the effect that he has probable cause to believe that the crime of perjury was committed before the Carroll County Superior Court in that contradictory testimony was given before said Court by David S. Sands and Linda Clough with respect to who signed the name of William Smith to certain petition for attachment filed with that Court in the case of Smith vs. Plante on February 1, 1975; that I personally heard Sands and Clough on April 27, 1977, in connection with the case of Blaeser vs. Schroeder, et al.; that Sands testified that one Thomas Tsoumas signed the name William Smith to said petitions; that from Clough's testimony only David Sands could have signed said petitions; that, according to Cox, there are in the hands of John D. McLaughlin, Clerk of said Court certain impounded documents which are handwriting examples of both Tsoumis [sic] and Sands and which are evidence of the crime of perjury to which this application for a search warrant relates, that Cox has personally seen these exemplars in said Clerk's Office, that these exemplars are on file in the case of Blaeser vs. Schroeder, et al.; that the exemplars consist of the following . . . ."

In his testimony under oath before the magistrate, the deputy sheriff essentially set forth the facts which Linda Clough had described concerning the circumstances under which Sands had signed the *Plante ex parte* petition for attachment. The magistrate made notes of this testimony and also recorded it on a cassette tape recorder.

We have stated that "[p]robable cause to search exists if the man of ordinary caution would be justified in believing that what is sought will be found in the place to be searched . . . and that what is sought . . . will 'aid in a particular apprehension or conviction.'" *State v. Doe,* 115 N.H. 682, 685, 371 A.2d 167, 169 (1975) (citations omitted); *see State v. Marcotte,* 123 N.H. 245, 248, 459 A.2d 278, 279–80 (1983); *see also Zurcher v. Stanford Daily,* 436 U.S. 547, 556–57 & n.6 (1978). In deciding whether probable cause exists, a magistrate may consider information submitted under oath either orally or by affidavit. *State v. Doe,* 115 N.H. at 684, 371 A.2d at 168; *State v. Moreau,* 113 N.H. 303, 307, 306 A.2d 764, 766 (1973). Hearsay may establish probable cause for the issuance of a search warrant if, given the totality of the circumstances, including the inform-

ant's veracity and reliability and the basis of his information, there is a fair probability that the evidence will be found in a particular place. *Illinois v. Gates*, 103 S. Ct. 2317, 2332 (1983); *see also State v. Beaulieu*, 119 N.H. 400, 403, 402 A.2d 178, 180 (1979); *State v. Mandravelis*, 114 N.H. 634, 637–38, 325 A.2d 794, 795–96 (1974).

Affidavits in support of search warrants must be read, tested and interpreted in a realistic fashion and with common sense. *State v. Marcotte*, 123 N.H. at 248, 459 A.2d at 280; *State v. Breest*, 116 N.H. 734, 743, 367 A.2d 1320, 1328 (1976). Reviewing courts should pay great deference to a magistrate's determination of probable cause and should not invalidate a warrant by interpreting the evidence submitted in a hypertechnical sense. *Illinois v. Gates*, 103 S. Ct. at 2331; *United States v. Ventresca*, 380 U.S. 102, 109 (1965). The resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *Id.; see State v. Marcotte*, 123 N.H. at 248, 459 A.2d at 280. *See generally* 1 New Hampshire Practice, Criminal Practice and Procedure §§ 51–61, at 24–36 (R. McNamara 1980).

The affidavit in this case revealed that Deputy Sheriff Kilmer, the affiant, personally heard the contradictory testimony of Sands and Clough as to who had signed the *ex parte* petition for attachment. The affidavit identified the specific date of the testimony as well as the underlying case to which the testimony related. In addition, the affiant's oral testimony before the magistrate supplemented the affidavit by describing the specific testimony of Clough. While the deputy sheriff's personal observations alone could have supported a finding of probable cause, the affidavit further contained statements of a third party, Attorney Frederick L. Cox, verifying the affiant's personal observations. The affidavit revealed that Cox was the county attorney and had been a practicing attorney for nearly twenty years, and therefore was a reliable and credible individual. Thus, applying a commonsense analysis, we hold that the deputy sheriff's affidavit and oral testimony provided sufficient information to allow the magistrate to make an objective and detached determination that probable cause existed. *See State v. Spero*, 117 N.H. 199, 204, 371 A.2d 1155, 1158 (1977).

Furthermore, the record shows that the magistrate knew that the crime charged was perjury involving conflicting statements as to whether Sands or Tsoumas was the signatory of the *Plante ex parte* petition for attachment. The magistrate could reasonably have concluded that the items sought, handwriting samples of Sands and Tsoumas, might have assisted the State in convicting Sands of per-

jury. Contrary to the defendants' argument, the fact that the magistrate may not have realized that Tsoumas also was to be charged with perjury did not invalidate the warrant application.

The defendants next argue that the search warrant was invalid because the supporting affidavit and oral testimony were not given under an appropriate oath. The judge who administered the oath required the affiant to raise his hand and then asked him if "these [words] are the truth to the best of your belief and knowledge" and "do you swear they [are] the truth, the whole truth and nothing but the truth?" The affiant replied in the affirmative. The defendants contend that the oath was inadequate because the statutes governing swearing and affirmation, RSA 516:19 and RSA 516:20, require that the oath be made expressly to God or under the pains and penalties of perjury.

We do not agree with the defendants' overly technical interpretation of the statutory provisions. Neither RSA 516:19 nor RSA 516:20 expressly requires that the oath be made to God. As previously mentioned, the purpose of the oath is to ensure that the affiant consciously recognizes his legal obligation to tell the truth. *See Cooper v. Bisbee*, 4 N.H. at 336. We find that the oath administered by the magistrate, requiring the affiant to raise his hand and swear to the truthfulness of his statements, sufficiently impressed upon the deputy sheriff his obligation to tell the truth. As a result, we are persuaded that the magistrate's oath constituted "swearing" within the meaning of the statutory provisions, despite his failure to use the words "So help you God." *Accord, State v. Hulsman*, 147 Iowa 572, 573-74, 126 N.W. 700, 701 (1910); *People v. Mankin*, 225 Mich. 246, 251-52, 196 N.W. 426, 428 (1923).

The defendants further argue that the documentary evidence seized should have been suppressed because of improper conduct by those acting on behalf of the prosecution. The defendants' claims include: (1) an alleged violation of Superior Court Rule 56, which states that papers shall not be withdrawn from the superior court files except by leave of the court; (2) an allegation of collusion between the clerk of the Carroll County Superior Court and the county attorney to obtain court records illegally; (3) an alleged deprivation of due process resulting from a conspiracy between the county attorney and counsel in the *Blaeser* civil action to bring perjury charges against the defendants; and (4) noncompliance with RSA chapter 595-A entitled "Search Warrants."

The trial court recognized that the central issue here concerned the validity of the search warrant. The court rejected the defendants' argument that the seizure of the documents was contrary to an

agreement entered into by the attorneys in the *Blaeser* civil litigation or that it violated the intent of the Court's (*Brock,* J.) ruling rescinding an impoundment order and permitting the release of the documents to the parties. The court held that RSA 595-A:1 authorized the district court to issue the warrant if it found probable cause to exist, and that Superior Court Rule 56 was not a bar to the search and seizure of court records.

 We agree with these rulings. As the State correctly notes in its brief, a private agreement between attorneys in a civil case does not insulate records or other evidence of a crime from seizure by the State in a criminal matter. Likewise, the court's release of documents to the parties was not intended to preclude the State from seizing the documents in the course of a related criminal investigation. Furthermore, the defendants' reliance on Superior Court Rule 56 is misplaced. We interpret Rule 56 as governing the informal withdrawal of records from the court. The rule does not restrict or otherwise prevent the withdrawal of records for criminal investigatory purposes, pursuant to a valid search warrant authorized by RSA 595-A:1.

 The trial court also ruled that there had been substantial compliance with the terms of the search warrant statute, RSA chapter 595-A. The court indicated that the fact that the same person, Deputy Sheriff Kilmer, had both applied for the search warrant and verified the inventory under RSA 595-A:5 did not require suppression of the documents. Again, we agree. On its face, RSA 595-A:5 does not mandate that the person verifying the inventory be an individual different from the applicant. *See State v. Saide,* 114 N.H. 735, 737, 329 A.2d 148, 149 (1974) (inventory taken by applicant for warrant). However, even assuming *arguendo* that such a requirement exists, we have held that technical shortcomings in complying with the statute, which would be the case here, do not require suppression of the evidence seized. *E.g., State v. Gilson,* 116 N.H. 230, 234, 356 A.2d 689, 692 (1976); *State v. Saide,* 114 N.H. at 737–38, 329 A.2d at 149.

The trial court stated that "there was a substantial amount of evidence presented by the defendants relating to the . . . propriety of the action and doings of the prosecutor, county attorney . . . other members of the bar [and the] attorneys in the underlying civil actions." It found the thrust of the defendants' argument to be that the seized documents were "the illegal end products of a concerted effort to utilize threatened criminal investigation or prosecution to gain benefit in a pending civil action [*Blaeser v. Schroeder*] to the

detriment of the defendants, and in derogation of their basic constitutional rights." The court ruled that the evidence presented was not sufficient to establish such a claim and that the allegations were of no moment to the central issue before it, which concerned the validity of the search warrant.

■ The record supports these findings. As noted above, the search warrant, which was executed after the civil litigation had been settled, was based upon probable cause and satisfied all legal requirements. The evidence failed to show that the county attorney had been motivated by improper desires. Moreover, any impropriety on the part of private counsel in the civil litigation would be irrelevant in determining whether the documents should have been suppressed. *See Burdeau v. McDowell*, 256 U.S. 465, 475 (1921) (fourth amendment protections do not extend to actions taken by private parties); *State v. Keyser*, 117 N.H. 45, 46–47, 369 A.2d 224, 225 (1977). For all the foregoing reasons, we hold that the defendants' motions to suppress were properly denied.

### G. *Admissibility of Documents Produced in Blaeser Litigation*

At the outset of the jury trial in the instant case, the defendant Tsoumas, supported by the defendant Sands, whose standing with respect to this issue was questionable, moved to suppress Tsoumas' deposition in the *Blaeser* litigation, as well as other documents that had been obtained during that deposition. The motion was denied, and the defendant Tsoumas now claims that the admission at trial of the deposition and the documents produced thereat constituted reversible error because these exhibits had been obtained in violation of his federal constitutional rights under the fourth amendment and his State constitutional right to a reasonable expectation of privacy.

Tsoumas claims that the evidence was obtained at his deposition as a result of deception and subterfuge between law enforcement officials acting in concert with private counsel in the civil litigation. He argues that the production of a bank signature card and bank withdrawal slips, which was compelled by process initiated by the private counsel, constituted an unreasonable seizure of his financial records.

■ The record, however, fails to support these claims. The evidence shows that the attorneys in the *Blaeser* litigation subpoenaed Tsoumas' bank records in order to determine the existence, identity, and whereabouts of "William Smith," who was a defendant in the *Blaeser* suit. The trial court specifically ruled that the parties to the civil action had made valid use of the discovery vehicles. We find that the attorneys were rightfully engaged in the protection of their

clients' interests, and that their cooperation with the State did not violate any of the defendants' constitutional rights.

 Furthermore, as we mentioned in the previous section, even if private counsel had acted improperly, such conduct would not implicate the defendants' fourth amendment rights unless the State participated in or actively encouraged the illegal action. *See Burdeau v. McDowell*, 256 U.S. at 475; *see also State v. Merski*, 121 N.H. at 913–14, 437 A.2d at 717. Here, the record is devoid of any evidence of such conduct by the State. To the contrary, the record shows that the county attorney did not prompt or encourage any contact with the attorneys in the civil case, and that any information or advice given by him was proper.

The defendant Tsoumas also challenges the superior court's appointment of a commissioner to take his deposition in the *Blaeser* litigation. He claims that the deposition should have been suppressed because New Hampshire law does not authorize the appointment of commissioners to take depositions within this State.

 The record before us shows that at the time of his deposition the defendant did not raise any objection to the appointment of the commissioner. We recently held that the failure to make a timely objection to the appointment of a master and auditor constituted a waiver of any subsequent claim that these appointments were invalid. *Proctor v. Bank of New Hampshire, N.A.*, 123 N.H. 395, 402, 464 A.2d 263, 267 (1983); *see also Provencal v. Provencal*, 122 N.H. 793, 796, 451 A.2d 374, 376 (1982). Nevertheless, we will address the defendant's argument because the record indicates that he raised this issue in his motion to quash the indictments in the instant case.

 Under RSA 517:15, the superior court may appoint a person as commissioner to take depositions outside the State. According to our interpretation of RSA 517:2, once such a commissioner is appointed, he may then also take depositions *within the State*, even though he may never have exercised his out-of-state powers. We hold that the commissioner appointed in this case had the authority, although he never exercised it, to take depositions out of State; thus, he was also empowered to take the defendant Tsoumas' deposition within the State.

 Our conclusion that the commissioner was properly appointed is consistent with our previous holdings that trial courts have a great deal of discretion to appoint commissioners and to make such orders concerning deposition procedure as justice may require. *See New Castle v. Rand*, 102 N.H. 16, 21–22, 148 A.2d 658,

662 (1959); *Starkey v. Harvey*, 98 N.H. 96, 97, 95 A.2d 140, 140 (1953). We also note in passing that, contrary to the defendant Tsoumas' argument, we find that the commissioner herein was a "person taking evidence in connection with [an official] proceeding," namely, the *Blaeser* civil litigation, and the deposition therefore could form the basis of a perjury conviction under RSA 641:1, II.

As a final matter, we reject Tsoumas' claim that disclosure of his financial documents in the *Blaeser* civil litigation violated his right to privacy. In *Calderwood v. Calderwood*, 112 N.H. 355, 359, 296 A.2d 910, 912 (1972), we held that documents relating to an account between a depositor and a bank are not privileged from discovery when they are related to an essential element in issue. Because Tsoumas' financial documents were important for purposes of determining the identification of "William Smith" in the *Blaeser* litigation, we hold that their disclosure did not violate the defendant Tsoumas' rights. *See generally* RSA ch. 359-C (Supp. 1981) (Right to Privacy Act).

Accordingly, we find no error in the denial of the motions to suppress.

## H. *Evidentiary Rulings*

The defendants challenge various evidentiary rulings by the trial court. They first assign as error the admission of evidence relating to the dates upon which certain documents had been prepared and executed. The documents at issue included: a six-page handwritten agreement between Sands and Tsoumas, dated January 11, 1975; a promissory note from Tsoumas to Sands, dated February 15, 1974; and a schedule of beneficial interests, also dated February 15, 1974.

The Federal Bureau of Investigation (FBI) analyzed the documents, and an FBI handwriting expert testified at length for the State concerning the results of the examination. The FBI expert stated that, in his view, the six pages of the handwritten agreement had been prepared at one time from the same pad of paper. He concluded, based upon impression marks which resulted when the writings of one page were pressed onto the sheet beneath it, that the six pages were not prepared in sequence. He also testified that original writing from the February 1974 promissory note and a subsequent notation marked "paid in full, 1/16/75, David Sands" were impressed upon the schedule of beneficial interests, but that two portions of the note—the date, and the words "William Smith, Trustee, Forest Preservation Trust"—were not impressed upon the schedule.

The defendants failed to object to this testimony. They did, however, object when the State sought to introduce the three documents

and a blow-up showing the impression marks. They also objected when the State asked their handwriting expert on cross-examination whether his conclusions with respect to the six-page agreement would have been the same if the document had been prepared in April 1977, instead of in January 1975. The defendants argued that the impression evidence and the prosecution's hypothetical question were immaterial and prejudicial because such evidence suggested that the documents had been fabricated, an allegation which the defendants claimed was unsupported by the other evidence in the case. The trial court ruled that the exhibits were material and relevant to the crimes charged and therefore denied the objections.

■■■ We agree with the court that a sufficient foundation existed for the admission of the impression evidence and that such evidence was relevant. As discussed in earlier sections, the trial testimony created an inference that Sands was actually "William Smith" and had engaged Tsoumas to participate in a cover-up of this fact. The impression evidence supported this inference and supplemented the earlier testimony by revealing numerous abnormalities in the drafting of the documents. For instance, the evidence revealed that the pages of the handwritten agreement had been drafted in a haphazard fashion and that the promissory note, unlike the agreement, was not originally dated or signed "William Smith, Trustee, Forest Preservation Trust." The evidence also indicated that the parties may have drafted the promissory note and marked it "paid in full" at the same sitting. The evidence thus was clearly relevant as to whether Sands had participated in a scheme to cover up his identity as "William Smith." In addition, the evidence provided a sufficient basis for the prosecutor's hypothetical question.

The defendants next argue that the admission of what they categorize as defendant Sands' "legal strategy" in the *Blaeser v. Schroeder* case was prejudicial and therefore erroneous. As previously mentioned, Sands represented "William Smith" in the *Blaeser* civil litigation. During the trial in the criminal case at bar, there was testimony, over the defendants' objections, that the civil litigation was "a very unusual case," that Sands had taken an exception to testifying in the civil case on the ground that it would have been unusual for him to testify, and that eleven months had elapsed before Sands revealed that Tsoumas was allegedly "William Smith." The defendants challenge the introduction of this testimony.

We find that the testimony was relevant to the State's central argument that Sands himself was "William Smith" and that the perjury resulted as an attempt to conceal this fact. The evidence regarding Sands' prolonged and persistent refusal to disclose

Smith's identity, as well as the insubstantial basis for his exception to testifying, created an inference that Sands was trying to keep the identity of "William Smith" secret because such a disclosure would have been damaging to Sands' interests. Thus, the evidence provided circumstantial support for the State's argument. *See State v. Wayne Kelley*, 120 N.H. 14, 16–17, 413 A.2d 300, 302 (1980); *cf. State v. Taylor*, 118 N.H. 855, 857, 395 A.2d 505, 507 (1978) (flight from scene creates inference of guilt). The testimony relating to the unusual nature of the *Blaeser* suit was also relevant as general background information for the jury.

In determining the admissibility of relevant evidence, the trial court must consider whether the possible prejudice resulting from such evidence outweighs its probative value. *State v. Donovan*, 123 N.H. 446, 447, 462 A.2d 125, 126 (1983); *State v. Baker*, 120 N.H. 773, 775, 424 A.2d 171, 172–73 (1980). We are unable to see how any prejudice could have resulted from the testimony that the *Blaeser* litigation was a "very unusual case." Additionally, any prejudice resulting from the other testimony was clearly outweighed by its probative value with respect to whether Sands was attempting to cover up the identity of "William Smith." As a result, we conclude that the trial court properly exercised its discretion in allowing this testimony.

The defendants also argue that they were entitled to read to the jury an excerpt from this court's decision in *Sawyer v. Boufford*, 113 N.H. 627, 629–30, 312 A.2d 693, 694–95 (1973), which stated that a defendant has a right, under some circumstances, not to disclose financial information in a civil case. The trial court sustained the State's objection to the reading and introduction of this material as substantive evidence. It found that the reading of the proffered text of law would be of no significant aid or benefit to the jury and that questions of law were for the court rather than for the jury. It further found that the specific text was not material to the underlying issues and was likely to mislead the jury.

The trial judge, however, specifically instructed the defendants that they were not foreclosed from making further inquiry on this subject matter, as long as they did not "delve into case law." Nevertheless, the defendants failed to accept the invitation to pursue the issue through proper questioning. We hold that the trial court's rulings were not only substantively correct, but also fair and reasonable under the circumstances.

The defendants next argue that the trial court erred in allowing the State to inquire, during its cross-examination of a defense witness, why the witness, a friend of the defendant Tsoumas, had failed

to inform law enforcement officials that he purportedly possessed exculpatory information. They furnish us with no authority to support their argument.

On the other hand, our research reveals several jurisdictions which have permitted the State, upon the laying of a proper evidentiary foundation, to cross-examine a witness regarding the reasons for his failure to come forward with allegedly exculpatory information. *E.g., Commonwealth v. Hesketh,* 434 N.E.2d 1238, 1244–45 (Mass. 1982); *People v. Dawson,* 50 N.Y.2d 311, 321, 406 N.E.2d 771, 777 (1980); *Commonwealth v. Rodgers,* 372 A.2d 771, 782 (Pa. 1977); *see People v. Watson,* 94 Ill. App. 3d 550, 558, 418 N.E.2d 1015, 1021 (1981). Such inquiry relates to the witness' credibility, because an individual who is aware of an impending prosecution and who truly possesses exculpatory information is likely to contact the law enforcement officials working on the case, and the failure to do so creates an inference that the witness' testimony is fabricated. *Commonwealth v. Rodgers,* 372 A.2d at 782.

 In this jurisdiction, the trial judge has broad discretion in determining the scope of cross-examination and, absent abuse, we will not overrule him. *See State v. Ramos,* 121 N.H. 863, 866, 435 A.2d 1122, 1124 (1981); *Kennedy v. Ricker,* 119 N.H. 827, 832, 409 A.2d 778, 781 (1979). We hold that the trial court properly allowed the State's inquiry in the instant case because the questioning tended to impeach the witness' credibility.

The defendants further argue that the trial court erred in limiting their questioning of the county attorney, Frederick L. Cox, who was a witness at trial. Basically, the defendants wanted to examine Cox with respect to his involvement in the civil litigation between the Plantes and his client, Roger Krey. *See* § I, pt. B *supra.* They also sought to question him regarding his prosecution of the Plantes and his failure to prosecute the Schroeders. The trial judge limited the questioning to matters involving the county attorney's actions and contacts with the attorneys in the *Blaeser* civil case around the time of the events giving rise to the indictments in the cases at bar.

 We find that the proposed inquiry concerning the *Krey-Plante* litigation and the county attorney's previous prosecutorial decisions was irrelevant to the issues involved in these perjury prosecutions. The proposed inquiry would have led to an extended discussion of tangential matters, thereby confusing and misleading the jury. For these reasons, we conclude that the trial court's ruling did not represent an abuse of its discretion to admit or exclude evidence. *See generally State v. Thresher,* 122 N.H. at 71, 442 A.2d at 582 (admissibility of evidence falls within trial court's discretion).

Finally, the defendants contend that the trial court should have disqualified the county attorney at the outset from participating in the conduct of the trial, because at that time it was reasonably expected that he would be called as a defense witness. The trial court disqualified the county attorney from further participating in the trial after the defense called him to testify. The defendants argue, however, that the disqualification should have taken place during the initial stages of the trial. We find this argument, like the previous ones, to be without merit.

Superior Court Rule 17 provides that: "No attorney will be permitted to take part in a jury trial *after* he shall have testified for his client therein." (Emphasis added.) *See also* MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR 5-102 (1969) (adopted as N.H. Code of Professional Responsibility, by court order on April 26, 1977). We note that the federal courts have held that such a rule is inapplicable in a criminal case where the prosecuting attorney was called to testify by the defense, rather than by the State. *See Chessman v. Teets*, 239 F.2d 205, 214 (9th Cir. 1956), *vacated on other grounds*, 354 U.S. 156 (1957); *United States v. Maloney*, 241 F. Supp. 49, 51 (W.D. Pa. 1965). The decision to order withdrawal in such a case has been held to fall within the trial court's discretion. *Id.*

We hold that the trial court properly exercised its discretion in this case. Even assuming *arguendo* that Rule 17 applied, the trial court satisfied the rule by disqualifying the county attorney after he testified.

I. *Jury Instructions*

The defendants' final assignment of error focuses upon the trial court's jury instructions.

In reviewing such instructions, we have held that a trial court need not use the specific language requested by a party, as long as the court otherwise adequately states the law of the case. *State v. Fennelly*, 123 N.H. 378, 390, 461 A.2d 1091, 1097 (1983); *State v. Taylor*, 121 N.H. 489, 495–96, 431 A.2d 775, 779 (1981). We have also held that a single instruction should not be judged in isolation but must be considered in light of whether the overall charge fully communicates the relevant applicable law and standards to be followed by the jury. *State v. Bird*, 122 N.H. 10, 15, 440 A.2d 441, 443 (1982); *State v. Weitzman*, 121 N.H. 83, 91, 427 A.2d 3, 8 (1981).

The defendants first argue that the trial court erred when it instructed the jury that the State did not have to prove that the defendants knew or believed that the allegedly perjurious statements were false. They claim that such knowledge was an element

of the offense which the State had to prove beyond a reasonable doubt. We disagree.

RSA 641:1 denotes a person guilty of perjury "if in any official proceeding . . . he makes a false material statement under oath or affirmation . . . *and he does not believe the statement to be true* . . . ." (Emphasis added.) In accordance with the statutory language, the trial judge repeatedly instructed the jury that the State was required to prove beyond a reasonable doubt that the defendants did not believe the statements in question to be true. We reject the defendants' claim that because the statute required that they not believe their statements to be true, it implicitly required them to believe or know that the statements were false. Although this conclusion might seem logical on first impression, in practice it is often difficult to categorize in such a clear-cut manner one's knowledge or belief about the veracity of his statements. For instance, one who is indifferent or ill-informed about a matter may make a doubtful statement which he does not believe to be true, yet at the same time he may not affirmatively know or believe the statement to be false. *See* ALI MODEL PENAL CODE § 241.1 & commentary, at 114 (1980). As a result, we conclude that the trial judge correctly instructed the jury that the State was not required to prove beyond a reasonable doubt that the defendants believed or knew their statements to be false, but only that they did not believe the statements to be true. *See* COMMENTS TO N.H. CRIM. CODE as amended through July 1982, at 129; 4 WHARTON'S CRIMINAL LAW § 617, at 342 (14th ed. C. Torcia 1981).

We have not considered the material included in the defendants' briefs in reference to an instruction concerning indictment No. 3727, because the record shows that the defendants waived this issue by failing to object to the instruction at trial. *See State v. Niquette*, 122 N.H. at 873, 451 A.2d at 1294; *State v. Donovan*, 120 N.H. 603, 608, 419 A.2d 1102, 1105 (1980).

The defendants next argue that the court erred in not giving specific instructions which they had requested regarding the amount of circumstantial and direct evidence which was necessary to support a finding of guilty.

The charge given by the court, in relevant part, was as follows:

"As for circumstantial evidence, members of the Jury, you should take all of the facts, all of the evidence in the cases, all of the witnesses' testimony, all of the surrounding circumstances; and then you determine, and that is solely a question of fact for you, whether or not the reasonable inferences, which have been advanced and argued from

these facts, are sufficient to prove the fact or facts to your satisfaction beyond a reasonable doubt, or whether there has been a failure to do so.

Circumstantial evidence consists of proof of facts or circumstances which give rise to a reasonable inference of the truth of the fact sought to be proved. You may draw, in your role as jurors, you may draw reasonable inferences from each fact proved, and also inferences from facts found as a result of other inferences, provided that they can be reasonably drawn therefrom.

. . . .

You could have a situation where direct evidence is not as competent as circumstantial evidence, and the converse could be so. The law makes no distinction, members of the Jury, between the two. However, the ultimate question for you, when weighing either type of evidence, be it direct or circumstantial, is whether on all of the evidence, together with the reasonable inferences, so long as you so find, that can be drawn from it, such evidence proves a defendant's guilt beyond a reasonable doubt. Always the ultimate question.

Both types of evidence can be considered by you. The law, again, does not differentiate between them as to the weight you are to give either. You may give either type such weight as you find, based on all of the evidence it is entitled to or deserves. In view of the fact the State's burden in any criminal case is a heavy burden, the State is required, as I have mentioned throughout, to prove each element of the crimes charged beyond a reasonable doubt. The defendant is entitled to every inference in his favor which can be reasonably drawn from the evidence; and that being the case, where two inferences may be drawn from the same fact, one consistent with guilty and one consistent with innocence, if you were to so conclude, that's entirely within your role, judgment, and decision, after weighing the evidence on any given issue, then and in such an event the defendant would be entitled to the inference which would be consistent with innocence."

We hold that these instructions were fair and impartial, and adequately communicated the applicable law to the jury. Consequently, the trial court was not obligated to give the specific instructions requested by the defendants. *See State v. Fennelly*, 123 N.H. at 390, 461 A.2d at 1097.

■■■■■■■■■■■■■

■■■ The defendants next claim that the trial court failed to instruct the jury properly on the principles relating to conflicting statements of witnesses. The court instructed the jurors that, as the sole judges of the facts, they were responsible for weighing the testimony of all the witnesses. The trial judge stated that they should consider, *inter alia*, the witnesses' honesty, demeanor, intelligence, motives, bias, and interest. In addition, he stated that they could accept or reject all the testimony of any given witness, or they could accept such testimony in part and reject it in part. We conclude that these statements adequately set forth the principles relating to conflicting testimony.

The defendant Tsoumas further complains that it was error for the trial judge to have read the contents of indictment No. 3729 in his charge to the jury. Indictment No. 3729 alleged that Tsoumas had committed perjury when he stated under oath that he had drafted a promissory note to Sands on February 15, 1974. After initially summarizing the elements of all the indictments in the case, the trial judge stated that there was some confusion in his mind as to the actual charges and dates of indictment No. 3729 and, without any more emphasis, he then read the indictment to the jury.

■■■■■■ Instructions to jurors should contain "clear, concise, accurate and impartial statements of the law." 3 ABA STANDARDS FOR CRIMINAL JUSTICE, *Trial by Jury*, Standard 15-3.6(a) commentary, at 15-100 (2d ed. 1980) (citation omitted). The trial judge should ensure that the jurors have before them the proper standards of law to apply; he should modify and supplement the instructions whenever necessary. *Id.* Standard 15-3.6(b); *see State v. Bird*, 122 N.H. at 15, 440 A.2d at 443. In view of the complexity of the issues in this case and the uncertainty in the judge's mind relating to indictment No. 3729, we hold that it was not error for the court to clarify the allegations of this indictment by reading it to the jury.

Tsoumas' next argument also relates to indictment No. 3729. During the course of jury deliberations, the State proposed to enter a *nolle prosequi* on indictment No. 3729 due to a perceived technical defect in that indictment. The trial court properly recognized the authority of the State to withdraw the indictment. *See State v. Lavallee*, 104 N.H. 443, 445–46, 189 A.2d 475, 477 (1963). The defendant Tsoumas did not object to the *nolle prosequi*, but urged upon the court that the jury be immediately advised of the State's action. The trial judge, however, found that informing the jury of the withdrawal of the indictment against Tsoumas might result in prejudice to the defendant Sands. As a result, the judge ordered that the jury not be informed of the *nolle prosequi*. When the clerk of the court

subsequently inquired of the jury as to its verdicts, he did not ask about indictment No. 3729, and no verdict was returned on that indictment. The court then advised the jurors that the State had withdrawn the charge.

 The defendant Tsoumas contends that the court committed reversible error in failing to inform the jurors of the *nolle prosequi* while they were deliberating. We disagree. Because the trial involved highly complex consolidated cases against two different defendants, the trial judge had the formidable task of ensuring that a ruling relating to one defendant did not result in prejudice to the other defendant. In addition, the trial judge was placed in the difficult position of having to speculate about the impact of his ruling upon the jury. Although we are not convinced that Sands would have been prejudiced if the jury had been informed of the *nolle prosequi* relating to Tsoumas, we find that the possibility of such prejudice was a genuine concern. Furthermore, we find that any prejudice resulting to Tsoumas from the trial court's failure to inform the jury about the *nolle prosequi* was minimal because the court had specifically instructed the jury that the indictments by themselves were merely allegations and did not constitute any evidence of the defendants' guilt. Thus, we hold that the trial judge properly exercised his discretion to ensure that the trials were conducted in a fair and orderly manner. *See State v. Collins*, 115 N.H. 499, 503, 345 A.2d 162, 166 (1975). *See generally* 1 ABA STANDARDS FOR CRIMINAL JUSTICE, *Special Functions of the Trial Judge* Standard 6-1.1 & commentary, at 6.6–.7 (2d ed. 1980).

 The final issue raised by the defendants is their argument that the court erred in instructing and allowing the jury to make its own comparisons of handwriting samples. We find no merit to this contention. Despite the former rule at common law, juries are now permitted to compare authenticated handwriting specimens against questioned documents. *See University of Illinois v. Spalding*, 71 N.H. 163, 172, 51 A. 731, 733–34 (1901); 3 WHARTON'S CRIMINAL EVIDENCE § 527, at 25 (13th ed. C. Torcia 1973).

III. *Conclusion*

We have made a thorough and exhaustive review of the transcripts, exhibits, and other documents transferred to this court. We have researched a multiplicity of detailed and technical arguments, many of which are discussed in several different contexts. We cannot find any reversible error, and therefore our order is

*Affirmed.*

JOHNSON, J., superior court justice sitting by special assignment under RSA 490:3 (Supp. 1979), concurred; BATCHELDER, J., dissented; KING, C.J., and DOUGLAS and BROCK, JJ., did not sit; LAMPRON, retired supreme court chief justice, and MULLAVEY, J., superior court justice, sat by special assignment under RSA 490:3 (Supp. 1979) at oral argument but died prior to final preparation of this opinion.

BATCHELDER, J., dissenting: This appeal is a case of first impression, challenging the perjury statute, RSA chapter 641, insofar as it provides that "[w]hether a statement is material is a question of law to be determined by the court." RSA 641:1, II. I believe that by requiring an essential element of the crime, "materiality", to be determined by the court, the statute violates the defendants' constitutional right to have the elements of the crime necessary to support a conviction determined by a jury. *See State v. Goodwin*, 118 N.H. 862, 869, 395 A.2d 1234, 1238 (1978); *State v. LeClair*, 118 N.H. 214, 221, 385 A.2d 831, 835 (1978).

Although only a minority of the jurisdictions hold that the issue of materiality is for a jury to determine, *see, e.g., Commonwealth v. McDuffee*, 379 Mass. 353, 398 N.E.2d 463 (1979); *People v. Clemente*, 285 App. Div. 258, 262, 136 N.Y.S.2d 202, 206 (1954), *aff'd*, 309 N.Y. 890, 131 N.E.2d 294 (1955), in my opinion, the minority's approach is more consistent with our constitutional right to trial by jury. *See* N.H. CONST. pt. I, art. 15; *State v. Goodwin*, 118 N.H. at 869, 395 A.2d at 1238; U.S. CONST. amend. VI.

The New Mexico Court of Appeals, in commenting on the New York perjury statute, points to a distinction in perjury statutes generally which bears upon this case.

> "New York provides for two degrees of perjury. If the falsity is material the defendant may be found guilty of first degree perjury, a felony. If the falsity is not material the defendant may be found guilty of second degree perjury, a misdemeanor. Under these circumstances it is clear that materiality is a jury question since the determination of that issue determines the crime and the punishment."

*State v. Gallegos*, 644 P.2d 545, 546 (N.M. Ct. App. 1982). The presence or absence of the element of "materiality" in the New Hampshire statute marks the distinction between the class B felony of perjury and the misdemeanor of false swearing.

Because I believe the constitutional safeguard for defendants to have their cases heard by juries is of overriding importance, compared to the provisions in RSA chapter 641 relegating the determi-

nation of materiality to the court, I respectfully dissent, believing that this aspect of the statute is unconstitutional. I would order a new trial and not reach the other issues raised in the appeal.