Strafford
No. 89-013
No. 88-362

THE STATE OF NEW HAMPSHIRE

v.

ALLEN M. EASON

July 9, 1990

336

*John P. Arnold*, attorney general (*Michael D. Ramsdell*, assistant attorney general, on the brief and orally), for the State.

*Randall & Bownes*, of Laconia (*David H. Bownes* on the brief and orally), for the defendant.

PER CURIAM. In this appeal from his conviction for first degree murder, RSA 630:1-a, the defendant, Allen M. Eason, assigns error to the following findings and rulings of the Superior Court (*Nadeau, J.*): (1) that the State's failure to preserve certain evidence for trial did not deny the defendant his right to due process of law as guaranteed by the fourteenth amendment of the National Constitution; (2) that the State presented sufficient evidence to establish the defendant's guilt beyond a reasonable doubt; (3) that certain opinion testimony of the State's expert witness was admissible as within his field of expertise, N.H. R. EV. 702; and (4) that restriction on the scope of cross-examination of the victim's lawyer to issues not subject to a claim of privilege did not violate the defendant's right to effectively cross-examine her, N.H. CONST. pt. I, art. 15. We affirm.

In the spring of 1986, the defendant threatened on separate occasions to kill the victim, John Wilbur Drew (also known as Bill), because he was jealous of Drew's relationship with Michelle Kimball, the defendant's estranged girl friend. The last of these incidents occurred in Rochester on April 30, when, after a late night cookout attended by the defendant, Corey Bailey, Michelle and her sister Vicki, the defendant and the two sisters discovered Drew asleep in the Kimballs' nearby trailer home. Holding his knife, the defendant threatened once again to kill Drew, but was persuaded by Vicki to leave him alone. Drew remained in the trailer home until 5:30 on the morning of May 1, at which time he returned to his nearby van.

The cause of Drew's subsequent disappearance on the morning of May 1 was disputed at the defendant's trial. The State's principal witness, Corey Bailey, explained in the following manner how he and the defendant murdered Drew that morning and left his body in his van. According to Bailey, after leaving the cookout the previous night he went directly to sleep in a nearby tent. The defendant awakened him at 5:00 a.m., and told him, as Bailey understood it, that it was time to murder Drew as the two had previously contemplated. Bailey and the defendant then hid in Drew's van and waited twenty minutes for Drew's return. Drew lay down in the back of the van and went to sleep, at which point Bailey jumped on him and held his head down while the defendant stabbed him in the neck, apparently killing him.

Moments later, Michelle Kimball's father emerged from the trailer home. Bailey drove the van out of the trailer park, but soon stopped by a stream to allow himself and the defendant to clean their hands of blood, after doing which the defendant returned to the trailer home on foot and fashioned an explanation for Bailey's sudden departure. Bailey then drove the van to an isolated area, poured lighter fluid inside and out, inserted papers to act as a fuse to the gasoline tank, set it on fire and ran away. Several days later, he and the defendant returned to look at the burnt van, observed a headless, limbless corpse inside, and left.

The defendant, however, denied at trial any responsibility for Drew's murder and implied that Bailey had done it on his own. He testified that Bailey did not go to sleep on the night of April 30, but rather, left the campsite alone carrying the defendant's knife. The defendant claimed to have awoken at approximately 7:30 a.m. on May 1, having spent the entire evening in the tent without Bailey. He testified that he then went to the Kimball trailer home and spoke with Michelle. When he returned to his tent, Bailey allegedly informed him that he had "taken care" of Drew, and two days later he told the defendant that he had murdered Drew and had burned the van. The defendant's version of these events constituted the only evidence at trial that was directly at odds with Bailey's testimony.

Until his disappearance, Drew had been an employee of Frank Timmins, who had regularly entrusted his van to him. Drew had taken the van on the morning of April 30; and, when he failed to return it by the following morning, Timmins reported it stolen to the Nashua police. A week later the police recovered the van, which Brett and John Underhill had discovered abandoned on their property. Apparently due to the fire set by Bailey, the van's doors had welded shut, its paint and tires had burned off, its windshield, door handles, dashboard, steering wheel and seats had all melted, its roof had caved inward, and handles had burned off the steel tools left by Timmins in tool boxes in the back of the van.

Upon viewing the van's interior through its side window, the two investigating police officers and the Underhills observed what appeared to them to be a burnt animal carcass, and both officers observed a "stick" traversing the carcass from end to end. Having completed their investigation, the police had the van towed by Robert and Everett Park, who later disposed of the carcass at a local garbage dump. The Parks described the carcass at trial as having been a pig's, with a snout, short legs, a rump, curled ears, an exposed

and empty body cavity bisected by a "stick," and an underside that remained unburnt "hide, heavy hide."

Several days later, Farmington Police Sergeant Brown asked Everett Parks to recover the carcass from the dump, but he could not locate it. Soon afterward, on the basis of information supplied by the investigating police officers, Farmington Police Sergeant Peter Cosgrove concluded that the carcass had been an animal's and terminated his inquiry regarding it. At the time the police disposed of the carcass, they apparently had no reason to suspect that Drew had been murdered.

In November, 1987, a year and a half after discovering the burnt van, the police arrested Bailey and charged him with arson. During police interrogations, Bailey implicated both himself and the defendant in the murder of Drew, and, at the request of the Attorney General's Office, agreed to tape a telephone conversation between himself and the defendant, during which the following exchange took place:

"Bailey: Well, I told [the police] I burnt [the van]. They asked me, was Bill in it? Because you know that pig carcass there.

Defendant: Yeah, should have said no.

Bailey: What are we going to do man . . . they're coming down on me. They're eventually going to find out that . . . he was in it.

Defendant: No they won't. They wouldn't. You shouldn't have said nothing.

Bailey: No man, look I, I don't want to go in alone. They're going to get me for . . . burning the van, and . . . killing Bill. You're the one that stabbed him not me.

Defendant: Yeah, you helped.

Bailey: What?

Defendant: You helped.

Bailey: I know I helped.

Defendant: So you're going to get me in this too?

Bailey: No . . . I haven't said [anything] about you doing that . . . . I'm the one who burnt the van.

Defendant: Hey, I didn't do nothing.

Bailey: Don't give me that [nonsense].

Defendant: Yeah. Neither did you.

Bailey: I already told them I did.

Defendant: Yeah, dumb . . . .

Bailey: And they know that there was a carcass in the back.

Defendant: Yeah.

Bailey: But I don't know if they knew it was Bill or not.

Defendant: No, they don't . . . ."

Bailey subsequently entered a plea of guilty to accomplice to second degree murder for his participation in Drew's killing, and became the State's principal witness in its case against the defendant for murder in the first degree.

The defense's central strategy at trial was to impeach Bailey's credibility through the testimony of those who had observed the burnt carcass, all of whom claimed that it had not been Drew's corpse. To bolster Bailey's credibility, the State called Dr. Roger M. Fossum, a forensic pathologist and chief medical examiner for the State of New Hampshire, as an expert on the potential effects of intense heat on the physical appearance of a human body. Dr. Fossum testified that he had either personally performed or observed autopsies on over one hundred burnt bodies, some of which had been reduced to a

"charred mass of tissue that is essentially unrecognizable as human, and it looks somewhat like a two-and-a-half or three-and-a-half-foot log that may have a few stubby knobs or projections on it. . . . [T]he arms and the legs are generally completely burned away . . . leaving just small stubs . . . . The body shrinks considerably . . . . The head may or may not be recognizable . . . [and] may be essentially totally destroyed."

Dr. Fossum further testified that the most common causes of such disfigurement are "house fires and motor vehicle fires," and that, depending upon the position of the body when burned, there might be portions of badly burned skin remaining, which would be "black to a brown, very leathery, very tough material." In addition, Dr. Fossum observed that, "with the exception, of course, of the head and the hooves, . . . the torso area of the pig is remarkably quite like that of a human . . . and the rib cage is about the same size," and that "the spinal column . . . could look a bit like a stick."

Over the defendant's objection, Dr. Fossum further testified that a fire set in a van with an interior similar to the one burned by Bailey, which was hot enough to produce the fused metal and other effects observed on the Timmins' van, would have been hot enough to have disfigured a human corpse so far as to render it indistinguishable to the untrained eye from that of a pig. On cross-examination, however, Dr. Fossum stated that he had no scientific knowledge that would permit him to estimate the exact degree of heat in vehicle fires, and had no idea as to the probable temperature created by the van fire.

The defendant also introduced testimony at trial (apparently to provide an exculpatory explanation for Drew's disappearance) that implied that Drew had not been murdered but had fled to avoid charges pending against him in New Hampshire, and that he had done so for fear of going to prison for an extended period of time. To rebut this inference, the State called as a witness Drew's attorney, who testified that Drew faced three charges in New Hampshire, that he had accepted the State's offer of a plea and had filed a notice of intent to that effect. Drew's attorney further testified that the plea arrangement called for Drew to serve at most 140 days at the Strafford County House of Correction. On cross-examination, the defense elicited from Drew's attorney that the plea offer could be withdrawn by the State in the event that Drew violated his bail or parole terms or if he committed a subsequent offense, and that the judge could reject the negotiated plea. Drew's attorney, however, asserted Drew's attorney-client privilege with respect to conversations she had had with Drew concerning the plea negotiations; and the court, over the defendant's objection, recognized the privilege and limited the scope of the defendant's cross-examination accordingly.

In addition to this and other testimony, the State introduced the tape recording (and provided the jury a transcript of that recording) of the telephone conversation between Bailey and the defendant. And photographs of the van's interior and exterior, taken after the carcass had been removed, were received into evidence as well.

On appeal, the defendant first contends that the carcass discovered in the van was not Bill Drew's body, that it therefore constituted evidence that, if preserved, would have exonerated the defendant, and that his prosecution and conviction despite the State's failure to preserve the carcass for trial deprived him of his right to due process as guaranteed by the fourteenth amendment of the National Constitution. This claim, however, is without merit, as it

cannot be said that the police acted in bad faith in failing to preserve the carcass. *Arizona v. Youngblood,* 109 S. Ct. 333, 337 (1988).

 Contrary to the defendant's assertion, there was some question at trial as to the identity of the carcass; the eyewitnesses testified that they believed it to have been an animal's, but the State's expert witness, Dr. Fossum, testified that, such opinions notwithstanding, it may well have been the corpse of Bill Drew. In circumstances such as these, where evidence possibly useful to the defendant is lost or destroyed by the police, and where, consequently, a court can only conjecture as to what its exculpatory value might have been, the due process clause of the fourteenth amendment is violated only if the police acted in bad faith. *Id.* Furthermore, "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 337 n.2. The defendant has not shown that at the time they permitted the carcass to be disposed of the police harbored any suspicion that Drew had been murdered, much less that the defendant had murdered him. The defendant, therefore, has failed to show bad faith on the part of the police; they did not know, nor could they have been expected to know, of the potential evidentiary value of the carcass at the time they allowed it to be disposed of.

The defendant's second contention is that, as the testimony of the State's central witness, Corey Bailey, was not credible, no rational trier of fact viewing the evidence in the light most favorable to the State could have found the defendant guilty beyond a reasonable doubt. *See State v. Guay,* 130 N.H. 413, 421, 543 A.2d 910, 915 (1988). The defendant asserts that Bailey's testimony was discredited because, contrary to the implication of that testimony, the body discovered in the van was not Bill Drew's. This argument rests on two assumptions: first, that no rational jury could have concluded that the body was Bill Drew's and, second, that if such a jury believed that the body was not Drew's it had to discredit the remainder of Bailey's testimony. Viewed in a light most favorable to the State, however, the record does not support these assumptions, and thus the defendant's second argument fails.

 While it is true that all of the witnesses who viewed the body concluded that it had not been human, the State provided expert testimony to the effect that, given the probable intensity of the van fire, such lay conclusions were consistent with the indication of Bailey's testimony that the body had been Drew's and with the defend-

ant's own statements during the recorded telephone conversation. Furthermore, despite the fact that the defense introduced two witnesses who claimed to have seen Drew alive after May 1, 1986, the defendant himself testified that he had believed at the time of Drew's disappearance that Bailey had killed Drew and had left his body in the van on the night of April 30. Thus, even his own testimony was consistent with the expert's opinion. There was, therefore, sufficient evidence to enable the jury to credit Bailey's claim that he had left Drew's body in the van, and, consequently, to credit the remainder of his testimony.

But even if the jury felt that the body was not Drew's, the evidence tending to support Bailey's allegations was still sufficient to allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt. To begin with, the defendant's apparent admission of guilt during his tape-recorded telephone conversation with Bailey, perhaps even more damning than Bailey's testimony, may justifiably have assuaged any doubt in the jurors' minds as to the credibility of Bailey's general accusations. Furthermore, when given the opportunity on direct examination at trial to rebut the inference of guilt arising from this conversation, the defendant was unable to provide an intelligible alternative explanation. To the contrary, the defendant admitted to having had a motive, as well as the inclination, to murder Drew, and this testimony was corroborated by that of several witnesses for the State.

Finally, it was up to the jury to determine the weight and credence to be given Bailey's testimony. *See State v. Sands*, 123 N.H. 570, 590, 467 A.2d 202, 214 (1983). The jury observed both Bailey and the defendant testify, and it was within their province, given all of the evidence before them, to determine whom to believe. As there was sufficient evidence in the record for a rational jury to have credited the testimony of Bailey and thus to have found the defendant guilty beyond a reasonable doubt, the defendant's second contention is without merit.

The defendant's third claim on appeal is that the superior court erred in admitting Dr. Fossum's expert testimony insofar as it concerned the likely intensity of the van fire, since Dr. Fossum had no scientific training, and thus allegedly was not qualified as an expert, in such matters, N.H. R. Ev. 702. As we find, however, that Dr. Fossum's testimony did not presume any scientific knowledge beyond that which he had acquired through his experience and train-

ing, and that his testimony assisted the jury to determine a fact in issue in this case, N.H. R. Ev. 702, we hold that the superior court did not abuse its sound discretion in finding Dr. Fossum to be so qualified and in admitting this testimony, *see Freeman v. Scahill,* 92 N.H. 471, 473, 32 A.2d 817, 818 (1943).

As noted above, the State's purpose in introducing Dr. Fossum's testimony was to bolster the credibility of its principal witness, Corey Bailey. Dr. Fossum's testimony served this purpose by (1) enlightening the jury to the possibility that a badly burned human corpse could have been indistinguishable to the layman from an animal's, and (2) suggesting that the van fire could have had the requisite intensity to have inflicted such disfigurement on Drew's body. The defendant contends only that Dr. Fossum was not qualified to testify to the latter proposition.

The State established at trial that, as a forensic pathologist, Dr. Fossum had had extensive experience in examining burnt corpses, including those burned in vehicle fires, and in determining the circumstances under which such burns occur. Thus, although he did not have technical or scientific knowledge as to the precise temperature of the van fire at issue in this case, his experience in examining the debris left by similar fires, and in determining the causes of such fires, afforded him special knowledge of the circumstances necessary to create a fire intense enough to produce in a human body physical characteristics similar to those observed by the witnesses who viewed the carcass described in this case. *See Freeman v. Scahill supra* (car accident expert allowed to testify as to probable speed of vehicles involved in accident despite lack of scientific knowledge and despite fact that he did not view accident or damaged vehicles) (cited with approval in reporter's notes to N.H. R. Ev. 702). The defendant, therefore, is incorrect in asserting that Dr. Fossum's testimony regarding this matter presumed scientific knowledge that he did not possess. Although his lack of scientific knowledge necessary to calculate the precise temperature of the fire may have diminished the weight of his opinion, it did not necessitate its suppression. *See id.*

██ The final claim raised by the defendant is essentially that the superior court's ruling limiting the scope of his cross-examination of Bill Drew's attorney of record denied him his State constitutional right to "produce all proofs that may be favorable to himself" and to confront witnesses, N.H. CONST. pt. I, art. 15; *see State v. Ramos,* 121 N.H. 863, 866, 435 A.2d 1122, 1124 (1981). This claim, however, is also without merit because the defendant has failed to

provide the requisite showing that his need to cross-examine Drew's attorney as to matters protected by the attorney-client privilege warranted the suspension of that privilege. Although a trial court may not summarily reject a criminal defendant's claim of his right to cross-examine a witness who has correctly invoked the attorney-client privilege, it is up to a defendant who wishes to overcome an evidentiary privilege to show that the admission of privileged information is at least reasonably necessary to his defense. *See State v. Thresher*, 122 N.H. 63, 72, 442 A.2d 578, 582–83 (1982). The defendant here never indicated to the superior court what testimony he would have elicited had he been allowed to overcome the privilege, but merely speculated as to questions of alleged importance to his defense that he would have posed to Drew's attorney had he been allowed to do so. Thus, the defendant failed to show that the court's ruling limiting the scope of his cross-examination prejudiced his defense in such a way as to violate part I, article 15 of the New Hampshire Constitution.

 The defendant also argues that, because the State asserted at trial that Drew was dead, Drew's attorney should not have been allowed to claim the attorney-client privilege on his behalf. An attorney, however, is generally duty-bound not to disclose her client's confidential communications, RULE OF PROFESSIONAL CONDUCT 1.6, and cannot be expected to speculate as to his whereabouts in performing this duty. Thus, even if we assume, *arguendo*, that the privilege would have ceased upon Drew's death, the defendant's argument fails since Drew's whereabouts were in dispute at the time of trial and we, like Drew's attorney, cannot assume for the purpose of resolving this issue that he was dead at the time his attorney testified.

*Affirmed.*

HORTON, J., did not sit.